UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LORI A. DITZ,
                Plaintiff,

vs.                                         CIVIL NO. 2:08-CV-11547

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,            DISTRICT JUDGE AVERN COHN
                                            MAG. JUDGE. STEVEN D. PEPE

                Defendant

_____/


**Report and Recommendation**

**I.      Background**

Lori Ditz ("Plaintiff" or "Claimant") brought this action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying her application for  Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Both parties have filed motions for Summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

**A.      Procedural History**

Plaintiff filed an application for DIB on September 16, 2005, alleging a March 18, 2003, onset of disability due to a bi-polar condition involving depression, anxiety attacks suicidal thoughts, anger and sleep problems (September 23, 2003, Disability Report,  R. 62). In a June 22, 2007 Disability Report in addition to the depression / bi-polar impairments and sleep apnea

1

she added migraines, tennis elbow, back, knee, neck, foot/ankle pain (R. 91).   Plaintiff's claims

were initially denied on December 7, 2005  (R. 37-38).  She requested a hearing, which was held

before  Administrative Law Judge (ALJ) Roy L. Roulhac on August 8, 2007 (R. 36-7, 464-92).

Plaintiff was represented by Andrea Hamm whose firm represents her in this case.  Vocational

Expert (VE) Harris Cynowa also testified.   On October 19, 2007, the ALJ issued an opinion

denying Plaintiff's application (R. 14-26).  This became the Commissioner's final decision when

the Appeals Council denied Plaintiff's request for review on March 21, 2008 (R. 4-7).

      **B.**    **Background Facts**

      **1.**    **Plaintiff's Background**

     Plaintiff was born on September 29, 1962, and was 40 years old on the alleged disability

onset date (R. 25).  She completed 12th grade (R. 68).  Plaintiff's past relevant work experience

was as a motor vehicle assembler, quality clerk and industrial clerk (R. 63, 71-2).  Plaintiff's

daily activities included caring for her personal needs, preparing meals, housework, light

cleaning and shopping (R. 81-2).  She shopped for groceries and for clothing for herself and her

son but felt depressed about spending money after the initial rush (R. 82-3).  She said she had

trouble getting motivated and preferred to stay home, spending most of her day watching

television (R. 82-3). Plaintiff said she had difficulty concentrating to read books (R. 83). Plaintiff

went to church monthly and to sporting events once or twice per month (R. 83).

     At the hearing, Plaintiff testified that over the past year and a half she gained 30 pounds

because she eats food as a sort of drug when she gets upset. (R. 475) She is 5'3" tall and weighed

290 pounds at her last doctor's visit. (R. 475).  She testified that she cannot work because instead

of expressing her anger outwards, she turns it towards herself and wants to hurt herself (R. 476).

She is hesitant to go out unless she is with her son; and she lacks ambition, even to clean her home. She testified that her daily activities include taking her son to work; letting the dogs outside and feeding them; doing a load of laundry or loading the dishwasher but her husband does a lot of this; watching television although she testified to not being able to concentrate but instead has it on for background noise; and starting projects but never finishing them (R. 480).

Plaintiff experiences bad side effects from her medications including drowsiness and feeling jittery. (R. 479) She has monthly migraine headaches that vary in duration lasting up to several days requiring her to be in a dark room with no sounds. (R. 481) When her migraine headaches are bad she has to take the prescription or over-the-counter migraine medication (R. 481).

Plaintiff sees a therapist, Bev Lake, for her bi-polar condition (R. 481). Plaintiff testified that her mental condition makes it is hard for her to put thoughts into words (R. 484- 85). Her anxiety causes her to hyperventilate approximately four to five times a year. (R. 485). During the hearing she broke down crying, and explained that such crying spells were a daily occurrence. (R. 485). Plaintiff also has difficulty sleeping at night because her mind races even though her body is tired. (R. 485) Despite taking sleeping pills she still gets up sometimes. (R. 485).

As for her physical health, Plaintiff has difficulty with prolonged walking and standing as a result of a foot injury (R. 480). She also suffers from elbow pain (R. 480). Her foot and elbow problems required restrictions while working (R. 483-484). Her asthma causes problems with going up and down stairs. (R. 481) Plaintiff can carry and lift her eight-pound dog and can walk or stand 15 to 30 minutes (R. 487).

3

2.    **Medical Evidence**

**A. Medical Evidence From Prior to Plaintiff's March 2003 Alleged Onset Disability**

A September 2000 X-ray of Plaintiff's left foot, taken because of an injury, revealed no evidence of fracture or dislocation (R. 421). In May 2001, Patricia C. Nester, M.D., saw Plaintiff for pain caused by stubbing her left toe (R. 321). Dr. Nester noted that no treatment was necessary and recommended a follow-up appointment in a year (R. 321).

In March 2001, Dr. Mark Pensler saw Plaintiff for complaints of sleep problems and daytime sleepiness (R. 418). His impression was that Plaintiff likely had sleep apnea (R. 412, 417-18). Dr. Pensler noted Plaintiff, who was five feet three inches in height, weighed 240 pounds and had gained twenty pounds in the last year. He advised her to lose weight and not to drive if sleepy (R. 418).

Pulmonary function testing on August 27, 2001, indicated a moderate obstruction (R. 439). Dr. Robert Jackson and a physician assistant, Ms. Jennifer Garrett, noted that Plaintiff's asthmatic bronchitis responded well to Albuterol (R. 320). By September 18, Plaintiff reported that she felt eighty-five percent better in terms of her cough and ninety percent better in terms of her sinuses, and thus her asthmatic exacerbation was found to be much improved and stable (R. 317). In May 2002, Dr. Donna Angell and PA Ryan diagnosed that Plaintiff had "mild asthma" (R. 130).

In December 2001, Plaintiff told PA Garret that she had a previous fracture of her left lower extremity (R. 315). In May 2002, Dr. Angell noted that Plaintiff had some chronic pain in the left foot from an old fracture of the left second metatarsal (R. 312). But because of a recent weight loss of fifty pounds and daily exercise, Plaintiff's pain was much improved (R. 312). Dr.

4

Angell noted Plaintiff was taking Celebrex daily and that she had depression which was currently doing quite well without medication and was resolved (R. 311-12). Dr. Angell again noted Plaintiff's asthma was mild (R. 311).

A May 23, 2002 ultrasound showed multiple uterine fibryomas (R. 130, 404).

In July 2002, Dr. Angell prescribed Celebrex for Plaintiff's chronic left foot pain (R. 310-11). She also advised Plaintiff to resume the antidepressant Paxil and counseling and psychiatric care for her depression, which was resurgent in the past couple weeks (R. 311). In February 2003, Dr. Angell again noted chronic left foot pain and to continue the Celebrex (R. 307).

### B. Medical Evidence Since Plaintiff's March 2003 Alleged Onset Disability

In June 2003, Plaintiff told Dr. Angell she had been off work due to depression but that things were going better and she was feeling better (R. 305). Dr. Angell again noted Plaintiff's chronic foot pain and provided her some Celebrex samples (R. 305).

Also in June 2003, Plaintiff complained to Dr. Jackson and PA Garrett of tingling in her left fourth and fifth digits speculating that it might have been caused by excessive leaning on her left elbow during jury duty (R. 143). On examination, Plaintiff demonstrated tenderness surround the medial aspect of her left elbow in the region of the ulnar nerve (R. 143). Dr. Jackson and PA Garrett diagnosed an ulnar nerve compression with sensory change (R. 143). They advised Plaintiff to avoid leaning on her left elbow (R. 143).

In August 6-11, 2003, Plaintiff was hospitalized for treatment of bipolar disorder and had a $12,000 internet shopping binge. (R. 195). She reported suicidal thoughts (R. 195-202). She was threatening herself and others on admission ot the emergency room, and given a Global

5

Assessment of Functioning (GAF) of 15. (R. 223-4)  She responded well to treatment including reducing her antidepressants which contributed to her manic behavior and placing her on mood stabilizers.  psychotropic medications. After discharge, her GAF was assessed at fifty-five, indicative of moderate symptoms or difficulty functioning.[1]

In September 2003, Arthur L. Hughett, M.D., noted that Plaintiff's mood stabilizers greatly improved Plaintiff's mood and curtailed much of her excessive spending on Ebay.  (R. 202) Dr. Hughett said Plaintiff still had little mini highs and some lows, but not like what she used to endure.

In July 2006, her treater at Advanced Counseling Services gave Plaintiff  GAF of forty-five, indicative of serious symptoms or impairment in functioning (R. 293). Nonetheless, Plaintiff was given a good  prognosis. It was noted that she had cancelled here last appointment with Dr. Hughett   and ran out of medication in late February  which caused her to become manic and easily angered. In January 2007, Dr. Hughett noted that Plaintiff was doing pretty well  (R. 296). Adjusting the dosage of Abilify which caused jitteriness from 30 mg. to 15 mg. had resolved that problem and still controlled her anger.

---

[1]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32.  A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.*  A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.*  A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.  *Id.*

Her treater reported that after a hiatus from taking her medication, Plaintiff was compliant with her medication regime again and stable (R. 448-52). Plaintiff again missed an appointment with Dr. Hughett in March 2007 ( R. 297).  In April 2007, Dr. Hughett said Plaintiff was doing well, taking her medications, did not have any depression or mood swings, and was able to concentrate and function (R. 298).

On December 6, 2005, state agency psychiatrist Leonard Balunas, Ph.D., reviewed the record and concluded that Plaintiff could perform unskilled work (R. 278-92). Dr. Balunas assessed the severity of Plaintiff's condition, opining she had moderate restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in her ability to maintain concentration, persistence, or pace; and one or two episodes of decompensation (R. 278-88).  He believed that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public; and respond appropriately to changes in the work setting (R. 274-76). Dr. Balunas found Plaintiff was not significantly limited in all other aspects of mental work-related activities (R. 274-75). Dr. Balunas explained that Plaintiff had moderately limited ability to maintain prolonged concentration, but despite these limitations, she would be able to perform unskilled work (R. 276).

### 3.    **Vocational Evidence**

VE Harris Cynowa appeared at Plaintiff's administrative hearing and classified Plaintiff's motor vehicle assembler work as generally at the medium exertional level but at the light level as actually performed by the Plaintiff; her quality clerk job was semi-skilled at the light exertional

7

level, and the industrial cleaner was unskilled and medium (R. 488). VE Cynowa was asked to

consider a person of Plaintiff's age, education, and work experience, who was able to perform

light work that did not require more than occasional climbing of ramps or steps, balancing,

stooping, kneeling, crouching, and reaching; that did not require working around unprotected

heights or around concentrated exposure to dust, fumes, and gases; and that required only simple

tasks with low stress and only occasional decision making, and that did not involve close contact

with coworkers, and that involved dealing with things rather than people (Tr. 489). Mr. Cynowa

responded that such an individual could perform visual inspector-checker jobs (1,000 regionally,

greater than 80,000 nationally); small products assembler jobs (2,500 regionally, greater than

100,000 nationally); and hand packer jobs (2,500 regionally, greater than 100,000 nationally)

(Tr. 489).

Plaintiff's attorney asked the VE to assume the same set of factors for the hypothetical

individual with the additional limitation that the individual would need to miss work more than

two days per month due to medical conditions (R. 491). The VE testified that such an individual

would be precluded from work (R. 491).

### 4.    **ALJ Roulhac's Decision**

ALJ Roulhac found that Plaintiff met the insured status requirements of the Social

Security Act through June 30, 2009, and had not engaged in substantial gainful activity since she

allegedly became disabled (R. 19). He found that Plaintiff's history of uterine fibroids, obesity,

sleep apnea, migraine headaches and bipolar disorder were "severe" impairments within the

meaning of the Regulations, but not "severe" enough to meet or medically equal one of the

impairments listed in Appendix 1, Subpart P, or Regulations No. 4 (R. 19 and 21). He

specifically found that the elbow problem and asthma were not sever.  He made no findings

regarding her chronic foot/ankle impairment nor her back and neck claims.

He found that Plaintiff had a residual functional capacity (RFC) to perform light work,

being able to stand/walk for six hours and sit for two hours in an eight hour workday, being able

to push/pull with the above restrictions, occasionally being able to climb ramps/steps, balance,

stoop, kneel, crouch, crawl, and reach, needing to avoid unprotected heights, needing to avoid

concentrated exposure to dust, fumes, and gases, being limited to simple tasks, being able to do

occasional decision making, no interaction with coworkers, and being willing to deal with things

rather than people (R. 21).  In determining Plaintiff's RFC, ALJ Roulhac afforded little weight to

Plaintiff's allegations that her symptoms resulted in a RFC precluding her from performing her

past relevant work (R. 24).   He found that the allegations by the claimant as to the intensity,

persistence and limiting effects of his symptoms were not well supported by probative evidence

and not wholly credible, because Plaintiff's statements regarding the effects of her impairments

on her ability to work were not consistent with the medical and other evidence taken as a whole

(R. 21-24).

He found that Plaintiff did not retain the RFC to return to her past employment of motor

vehicle assembler, quality clerk and industrial cleaner, but did find that a significant number of

jobs existed in the national economy as identified by the VE that she could perform (R. 24-5).

Thus, she was not disabled within the meaning of the Social Security Act (R. 26). **Analysis**

### A.  <u>Standards of Review</u>

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is

supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

### B.  Factual Analysis

In her motion for summary judgment, Plaintiff argued that (1) ALJ Roulhac improperly assessed Plaintiff's credibility, effects, symptoms and limitations of her numerous medical conditions; (2) ALJ Roulhac failed to give proper weight to the opinions and assessments made by the Plaintiff's treating physicians; (3) The ALJ failed to pose complete and accurate hypothetical questions to the vocational expert; and (4) The ALJ's decision was not supported by substantial evidence (Dkt. # 10).

### A.  Standards of Review

Plaintiff must establish that she became disabled under Title II of the Act prior to the her insured status expires.  *See* 42 U.S.C. § 416(I); 20 C.F.R. §§ 404.131(a), 404.320(b)(2)*; Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical

10

or mental impairment(s) must be of such severity that the individual can neither do her previous work nor engage in any other kind of substantial gainful work which exists in the national economy, considering her age, education, and work experience.  *See id.* § 423(d)(2)(A).

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).   The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts.  *Id.*  If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm.  *Studaway v. Secretary of HHS*, 815 F.2d 1074, 1076 (6th Cir. 1987); *Kirk v. Secretary of HHS*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  In determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry the burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.  *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

      **B.**      **Factual Analysis**

           **I. Plaintiff's Credibility**

Plaintiff challenges the Commissioner's decision arguing that the ALJ's credibility finding is not supported by the record because it fails to adequately assess Plaintiff's subjective estimation of her pain and limitations due to her numerous medical conditions.  Subjective evidence is only considered to "the extent [it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)) (*See Young v. Secretary,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary,* 801 F.2d 847, 852 (6th Cir. 1986) (Subjective complaints of a claimant can support a claim for disability, if there is also

objective medical evidence of an underlying medical condition in the record that would explain

such pain).  The issue of a claimant's credibility regarding subjective complaints is largely

within the scope of the ALJ's fact finding discretion – the Commissioner's "zone of choice" – if

adequately explained and supported by the record.

      The ALJ is not required to accept a claimant's own testimony regarding allegations of

disabling pain when such testimony is not supported by the record.  *See Gooch v. Sec'y of Health*

*& Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  The ALJ must, however, do more than say

the testimony is not credible based on generalities or merely recount the medical evidence and

claimant's daily activities and then without analysis summarily conclude that the overall

evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate

the claimant's testimony regarding pain.  *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994).

In order for an ALJ to properly discredit a claimant's subjective testimony, the credibility

determination must be accompanied by a detailed statement explaining the ALJ's reasons.

S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but

rather they must be specific.

      ALJ Roulhac had substantial evidence to discredit Plaintiff's testimony.  ALJ Roulhac

measured Plaintiff's testimony against the objective medical evidence, the claimant's daily

activities, the location, duration, frequency and intensity of her pain, precipitating and

aggravating factors, use of medications and treatment other than medications(R. 22-24).  Based

on a  comparison of her claims with the above mentioned factors, ALJ Roulhac found Plaintiff's

testimony not "entirely credible."  (R. 21).

      Plaintiff argues that there was ample evidence in the record to support her self reporting

13

functional limitations, such as medical documentation that she gained 37 pounds during the period of September 2005 - March 2007, complaints of sleep disturbance, sleep apnea, severe depression while working and years of counseling. It is true that this record has evidence both supporting and distracting from a finding of disability.   But as noted in the *Mullen* case above, this is not sufficient for a claimant to prevail.  The question before this Court is whether there is sufficient evidence to support the ALJ's rejection of Plaintiff's claim of disability.

Plaintiff's conditions, while very serious at August 2003 onset of her alleged period of disability, responded well to treatment.  Plaintiff reported in September 2003 that she felt a lot better after her medication dosage was adjusted (R. 202).  She took psychotropic medication which improved her GAF from a low of 15 when she was hospitalized in August 2003 to 45 in July 2006  (R. 22, 195-202, 293).  The ALJ acknowledged that the GAF score of 45 was low. Yet,  Dr. Hughett felt that Plaintiff's prognosis was good and reported considerable improvements in her condition over time.  ALJ Roulhac refers to Dr. Hughett's April 2007 report that Plaintiff was doing well, taking her medication, not having any depression or mood swings, and was able to concentrate and function (R. 23 referring to R. 298).

As to Plaintiff's daily activities, she contends that the ALJ should have adopted Dr. Balunas's assessment that she had moderate limitations in maintaining daily activities, whereas the ALJ found her to have mild limitations in light of her daily activities performed.   She cared for her personal needs, prepared meals, and did housework such as laundry, light cleaning, and shopping (R. 81-82). She shopped for groceries and for clothes for herself and her son (R. 82). And, while she said she preferred to stay home, she acknowledged that she went shopping and went to church monthly and to sporting events once or twice per month (R. 82-83).   Given

14

Plaintiff's improved status when she is compliant with her medication, there is a reasonable basis for the ALJ to have found her limitation in activities of daily living only mild.

Plaintiff also argues that the ALJ failed to discuss the side effects from her prescription medication, which she reported resulted in drowsiness, feeling jittery and difficulty concentration (Dkt. #10, p. 16).  The ALJ, however, did note that Dr. Hughett recorded that the dosage of Plaintiff's medication was adjusted in January 2007 resolving the problem of jitteriness (R. 23 and 296).  Even after missing her March 2007 appointment, when seen in April Dr. Hughett  found that with medication her depression and mood swings were improved and she was able to concentrate and function (R. 298).  On the issue of concentration, the ALJ accommodated Plaintiff's subjective reporting of her deficiency in this area by finding that Plaintiff was moderately restricted and limiting her RFC to simple tasks (R. 21-22).   More on the sufficiency of this accommodation is addressed below.

The drowsiness of which Plaintiff complains was supported by limited objective medical evidence.  ALJ Roulhac noted that Dr. Pensler, who treated Plaintiff for sleep apnea in 2001 advised her to avoid driving only if she were sleepy (R. 23, 418).  ALJ Roulhac found her sleep apnea to be severe and limited her work to avoiding unprotected heights.  No physician, other than Dr. Pensler's 2001 limited restriction on driving , placed any restrictions on Plaintiff (R. 24).  Nor is there any medical evidence of this impairment after Plaintiff's 2003 onset date. Thus,  ALJ Roulhac had a reasonable basis to discredited Plaintiff's testimony concerning her sleepiness to the extent that Plaintiff could perform a limited range of light inspection, small assembly and hand packaging work.   Therefore, it is recommended that ALJ Roulhac's credibility determination not be overturned.

15

### ii. Plaintiff's Treating Physician

Plaintiff argues that her complaints of chronic foot pain and ulnar nerve compression requiring the use of Celebrex for pain prescribed by her treating physician is dispositive in finding that she was entitled to benefits (Dkt. #10, p. 13). It is well established that the findings and opinions of treating physicians are entitled to substantial weight. An ALJ can reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20 C.F.R. §404.1527. The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d); *See also*, S.S.R. 96-2p.

Yet, the conclusion of whether a claimant is "disabled" is a decision reserved to the Commissioner to decide (R. 19). 20 C.F.R. §§ 404.1527(e)(1), (2), 416.927(e)(1), (2). And, "[w]e will not give any special significance to the source of an opinion on an issue reserved to the Commissioner." *Id*. at §§ 404.1527(e)(3), 416.927(e)(3).

As with the sleep apnea, the basis for Plaintiff's argument is, for the most part, from medical evidence that predated her onset of disability date. That evidence showed that she did indeed complain of chronic foot pain from an old fracture with a doctor prescribing Celebrex for the pain (R. 305-15). A May 2002 entry noted the chronic pain was much improved with a 50 pound weight loss ( R. 312). She apparently was able to perform her auto assembly work with

this problem and her sleep apnea.  Following a fall from a small stool in February injuring her head and buttock, she requested a handicapped sticker (R. 308).  Dr. Angell did not cite foot problems as reason for the sticker and indicates he only sought it through May (*Id.*)  The only evidence referring to her chronic foot pain after the onset date was on June 24, 2003, when Dr. Angell gave her some Celebrex and advised her to them on as-needed basis only (R. 305) .

Dr. Angell also diagnosed ulnar nerve compression, a condition that flared up with overuse and required restrictions when working (R. 306, 480).  The ALJ considered the diagnosis of ulnar nerve compression and noted that Plaintiff's clinicians advised her to avoid leaning on her left elbow but no treatment was advised (R. 20).   There is no indication that this advice did not resolve the problem.  Given the limited references to this condition,  with no treatment for the condition or restrictions,  ALJ Roulhac determined that the ulnar nerve compression caused Plaintiff no more than mild limitations and that her elbow problem  was not sever  (R. 20).  There is not sufficient evidence to overturn this finding.

Plaintiff correctly objects that the ALJ did not find her chronic foot pain a severe impairment.  The term "severe" is defined in the Regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities".  20 C.F.R. § 404.1520.  Yet, given the longstanding nature of ths problem, her ability to do auto assembly work with the impairment, and no significant evidence on this condition after her onset date, it is not conceivable that this condition would preclude Plaintiff from performing the  limited range of light inspection, small assembly and hand packaging work identified by the vocational expert.  Thus, this error does not warrant a reversal of the Commissioner's conclusion.

17

To the extent that Plaintiff is arguing that Dr. Angell's limited reference to foot pain and elbow pain is binding on the ALJ, the ALJ is permitted to discount any such treating physician opinion if it is based on claimant's subjective reports and the ALJ has sufficient reasons to discount the claimant's credibility. As discussed above regarding Plaintiff's credibility, there is substantial evidence to support the ALJ's conclusion that Plaintiff's complaints of disabling pain were not fully credible.   There is no other evidence during the relevant time period of disabling elbow or foot pain that Plaintiff's counsel points to.  Accordingly, the ALJ's discounting of Plaintiff's treating physician's opinion should not be overturned.

### iii. Hypothetical Question posed to Vocation Expert

Plaintiff claims that the ALJ asked the VE an incomplete hypothetical question because he did include all of Plaintiff's impairments and limitations.  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  To meet the burden of showing that Plaintiff could perform work that is available in the national economy, the Commissioner must make a finding "supported by substantial evidence that [she] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).  This kind of "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [his] individual physical and mental impairments.'" *Id.* (citations omitted).

Given that there is sufficient evidence to uphold the ALJ's finding that Plaintiff's elbow pain was not sever, that alleged limitation did not need to be included in the hypothetical. A

hypothetical question may omit non-severe impairments, *Benenate v. Schweiker,* 719 F.2d 291,

292 (8th Cir. 1983), but not impairments found by the ALJ to be severe, *Pendley v. Heckler,* 767

F.2d 1561, 1563 (11th Cir. 1985).

       Regarding her foot and ankle problem, that should have been found sever and included in

the hypothetical.  Yet, that error should be deemed harmless on this record given the

longstanding nature of this limitation.  Plaintiff's initial claim of disability and her initial

Disability Report did not mention her foot and ankle problem as a cause of her disability

(September 23, 2003, Disability Report,  R. 62).  It was added much later in her second

Disability Report  (June 22, 2007, Disability Report, R. 91).  The record shows that Plaintiff was

able to work in an auto assembly job with this problem, and there is absolutely no evidence that

this problem  was aggravated in any way after her claimed onset date.  It is not credible that this

foot and ankle limitation that Plaintiff had while performing her prior work would preclude her

from doing the light inspection, small assembly and hand packaging jobs identified by the

vocational expert upon which the ALJ relied.

       On Plaintiff's final objection to the hypothetical question not adequately dealing with

Plaintiff's limitations of concentration, Plaintiff's counsel cites Judge Cohn's opinion of *Bielat v.*

*Commissioner*  267 F.Supp.2d 698 (E.D.Mich. 2003). That decision notes:

> In general, a reference to "unskilled, sedentary work" is not
> sufficient to describe deficiencies in concentration. *See Newton v.*
> *Chater,* 92 F.3d 688 (8th Cir.1996) (holding that a reference to
> "simple jobs" was insufficient to constitute inclusion of the
> impairments or deficiencies in concentration noted by the ALJ);
> *McGuire v. Apfel,* 1999 WL 426035 at *15 (D.Or.1999) (holding
> that "simple work" was insufficient to describe claimant's
> deficiencies in concentration, persistence, or pace resulting in
> failure to complete tasks in a timely manner). The Commissioner
> notes that unskilled work by definition involves little judgment to

19

perform simple duties that can be learned on the job in a short
period of time. *See* 20 C.F.R. § 404.1568(a)(2001). As the
magistrate judge argued, though, a job may fit that description and
still require the ability to concentrate. Thus Bielat's ability to
"learn, understand, remember, and perform simple, rote tasks on a
sustained basis" is not necessarily enough to perform the sorts of
jobs mentioned by the VE. For example, monitoring security
cameras, a job the VE said could be performed by someone with
the limitations in the hypothetical question, is unskilled (as it
requires little judgment and may be learned in a short period of
time), but if someone in that job could not concentrate and pay
attention to the monitors, his performance would almost certainly
be deficient.

Id. at 702

Yet, *Bielat* is distinguishable in significant ways.  First, Bielat was found to have

"marked" limitations in concentration, persistence and pace and his consulting expert thought he

could not complete tasks in a timely manner (*id*. at 700).   In the present case, Plaintiff was found

to have "moderate" limitations of concentration ( R. 20).  The state evaluator who made this

evaluation also concluded Plaintiff could perform unskilled work. ( R. 288 & 292)  Also,

Claimant's  treating psychiatrist, Dr. Hughette in April of 2007 found Plaintiff able to

concentrate and function. ( R. 298).   It is also significant, that unlike the ALJ in *Bielat* , ALJ

Roulhac asked the VE in a follow up question to his hypothetical question whether limitations in

maintaining attention and concentration of up to 10% a day would preclude doing the jobs

identified, and the VE said  no, it would not preclude the jobs identified unless it reached 15% (

R. 490).  It was with this response to the expanded hypothetical on the record, that ALJ Roulhac

made his finding that Plaintiff could perform the light inspection, small assembly and hand

20

packaging jobs identified by the vocational expert.  While it would have been preferred for the
ALJ to also have made a specific finding that Plaintiff's concentration problems interfered with
her attention less than 15% of the work day, the hypothetical question as supplemented was not
flawed because it specifically addressed the degree of concentration limitations that were
compatible with performing the jobs identified.

        For these reasons, this case is substantially different from *Bielat* and the hypothetical
question in light of the record as a whole should not be found inadequate.

### iv.  Substantial Evidence

        The record as a whole supports the ALJ's assessment of the nature and severity of the
limitations caused by Plaintiff's impairments.  None of the physicians who examined and
diagnosed Plaintiff indicated a belief that would preclude ability to return to work, they all felt
that she could.   Under 42 U.S.C. 405(g), Congress has limited federal court's authority in
disability reviews, and if substantial evidence supports the ALJ's decision, as it does in this case
with many medical sources supporting the ALJ's finding, it must be affirmed – even if
substantial evidence also supports the opposite conclusion, and even if this Court would have
reached a different conclusion.  *See Buxton v. Halter*, 246 F.3d 762, 772-773 (6th Cir.
2001)(substantial evidence standard encompasses a "zone of choice" within which the
Commissioner can act without court interference (internal citations omitted)).  Given the
equivocal medical evidence and the evidence that Plaintiff could manage her personal care
needs, was oriented to person, place, and time, and in all other respects is able to function on a
daily basis, substantial evidence supports the ALJ's decision.

### IV.     Recommendation

For the reasons stated above, it is Recommended that Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: December 31, 2008                         s/Steven D. Pepe

Ann Arbor, Michigan                              United States Magistrate Judge

22

Certificate of Service

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 31, 2008 .

s/Jermaine Creary_____
Deputy Clerk